**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RICKY LEE HICKS,**

        **Plaintiff,**

**v.**                              **Case No.: 3:14-cv-30282**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's motion for judgment

1

on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On November 29, 2011, Plaintiff Ricky Lee Hicks ("Claimant") completed an application for DIB, alleging a disability onset date of June 4, 2009,[1] (Tr. at 199), due to "back problems, memory/concentration problems, depression, anxiety, bone spurs L4/L5 (no cartlidge) [*sic*], high blood pressure." (Tr. at 215). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 26). Claimant filed a request for an administrative hearing, which was held on February 13, 2014, before the Honorable Edward E. Evans, Administrative Law Judge ("ALJ"). (Tr. at 42-87). By written decision dated April 7, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 26-36). The ALJ's decision became the final decision of the Commissioner on October 20, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

---

[1] This date was later amended to May 1, 2011, approximately one month after Claimant's 50th birthday. (Tr. at 26, 51).

## II.    <u>Claimant's Background</u>

Claimant was 50 years old at the time he filed the instant application for benefits, and 52 years old on the date of the ALJ's decision. (Tr. at 199). He has a high school education and communicates in English. (Tr. at 214, 216). Claimant has previously worked as a service technician. (Tr. at 217).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of

decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 28, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 1, 2011, the amended date of Claimant's alleged disability onset. (Tr. at 28, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "obesity, degenerative disc disease, and arthritis." (Tr. at 28-29, Finding No. 3). The ALJ considered Claimant's alleged mental impairments under the four broad functional categories set forth in the Social Security regulations, but found these impairments to be non-severe. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 29-30, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a limited range of light work as defined in 20 CFR § 404.1567(b) except with: An individual of the claimant's age, education, and experience who can perform unskilled work at the light exertional level. The individual may occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. The individual should avoid concentrated exposure to hazards, vibration, and extreme cold, and he needs to be able to stand or sit at will.

(Tr. at 30-34, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 34, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 34-36, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1961 and was defined as younger individual age 18-49 on the alleged disability onset date, but subsequently changed age category to closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 34, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy, including work as an office assistant, mailroom clerk, and counter clerk at the light exertional level; and surveillance system monitor at the sedentary exertional level. (Tr. at 34-36, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 36, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ failed to fully develop the evidence related to Claimant's physical and

mental impairments. (ECF No. 10 at 10-11). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [his] multiple medical problems," the ALJ could not properly analyze his impairments as required by the regulations. (*Id.* at 11). Interspersed in Claimant's criticism regarding the development of the record is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians." (*Id* at 10). Claimant insists that the ALJ "ignored" the opinions of his treating physicians, Dr. Bal Bansal, Dr. Gregory Chaney, and Dr. Bruce Guberman. (*Id.*)

In his second challenge, Claimant argues that "the ALJ failed to consider and properly evaluate [his] claim under the combination of impairments theory." (*Id.* at 11-12). Claimant contends that his "medical and mental problems," when considered in combination, support a finding of disability. (*Id.*) He asserts that the combination of his impairments meet or equal "the listing for disability." (*Id.*) In support of his contention, Claimant cites the RFC opinions provided by Dr. Chaney, Dr. Bansal, and Dr. Guberman. (*Id.*). Within his second argument, Claimant again stealthily includes a criticism of the ALJ's consideration of the opinions of his treating physicians.

In response, the Commissioner maintains that the ALJ did not fail to develop the record and points out that Claimant had the burden to present evidence of his alleged disability. (ECF No. 11 at 11-15). As for Claimant's intermixed treating physician argument, the Commissioner avers that the ALJ properly evaluated the opinion evidence, and that the opinion evidence relied upon by Claimant is not supported by the medical record. (*Id.*). With respect to Claimant's second challenge, the Commissioner argues that there is no combination of impairments listing, and that Claimant has failed to identify any specific listing that his alleged impairments might meet. (*Id.* at 15-16) Additionally,

the Commissioner asserts that the ALJ clearly considered Plaintiff's combination of impairments at every step of the process, including in his crafting of Claimant's RFC finding and in the hypothetical questions the ALJ posed to the vocational expert. Accordingly, the Commissioner asserts that her decision complies with the relevant Social Security rules and regulations and is supported by substantial evidence. (*Id.*).

## V.   **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

On June 29, 2009, Claimant underwent an x-ray of his lumbar spine ordered and interpreted by Elizabeth Hay Martin, a chiropractor. (Tr. at 312). Dr. Martin found decreased disc spacing and osteophytes, possibly indicative of degenerative changes. However, she noted that Claimant had recently had a fall and was complaining of pain in his spine and left hip. Therefore, Dr. Martin felt a fracture of the interior endplate needed to be ruled out. (*Id.*).

On July 1, 2009, Dr. Martin completed a case history of Claimant. (Tr. at 313). She noted that Claimant was 6 feet 4 inches tall and weighed 260 pounds. He complained of lower back pain localized to his left side, which Claimant described as constant and sharp, especially with motion. He stated that the pain had been present for two months, ever since he fell, and was worsening. Claimant rated the pain as a 10 on a 10-point pain scale. Claimant indicated that the pain increased with driving, bending, and sitting, but was relieved with the use of ibuprofen and Excedrin PM. He reported that he had not seen any other health care provider before coming to Dr. Martin. (*Id*)

8

Dr. Martin performed an orthopedic examination of Claimant. (Tr. at 314-15). She found Claimant to have a normal Foraminal Compression Test and Shoulder Depression Test, indicating that he had no cervical foraminal encroachment, adhesions of the dural sleeves, or cervical spine nerve root issues. As far as lumbar testing, Claimant had a normal Heel/Toe Walk Test, demonstrating no weakness in the L5 and S1 dermatomes. However, Claimant had a positive Patrick FABERE test on the left side, indicating coxa pathology, and demonstrated radicular symptoms along his left sciatic nerve on the Valsava Maneuver. Claimant had a positive Ely's Sign on the left, suggesting inflammation of his left lumbar nerve roots. (*Id.*). In addition, Claimant had a positive Straight-Leg Raising Test at 60 degrees on the left while in supine position, which could indicate the presence of sciatica, subluxation syndrome, disc lesions, spondylolisthesis, adhesions, or interventricular foraminal occlusion. He also had a positive iliac Compression Test on the left side, which could be caused by left sacroiliac sprain, inflammation, subluxation, or fracture. However, Claimant's reflexes were 2+ bilaterally; his cranial nerves were normal; and his grip strength was normal. Claimant's range of motion testing of the cervical spine was decreased in extension and left lateral flexion, but was within normal limits in rotation, right lateral flexion, and cervical extension. (Tr. at 315). Lumbar range of motion testing was decreased in all ranges of motion, except left lateral flexion.

Based upon her examination, Dr. Martin diagnosed Claimant with lumbar region subluxation, sciatica, cervical region subluxation, and thoracic region subluxation. She created an individualized treatment plan for Claimant. (Tr. at 316). Dr. Martin recommended Diversified and Gonstead chiropractic manipulation. She also instructed Claimant to avoid any activities that elicited pain and not to lift things. (*Id.*).

The next medical record is dated February 22, 2012 and documents an MRI study of Claimant's lumbar spine. (Tr. at 318). The study showed mild to moderate multilevel degenerative changes with disc desiccation at L1 through S1. Specifically, at L1-L2 and L2-L3, there were mild diffuse disc bulges without herniation or significant central canal or foraminal stenosis. At L3-L4, there was a mild diffuse disc bulge to the left, contributing to mild left foraminal and canal stenosis. At L4-L5, there were similar moderate findings. Impingement on the exiting nerve root on the left could not be excluded. Finally, at the L5-S1 level, there was moderate to severe endplate degenerative changes with a mild disc bulge and posterior osseous ridging. There was also some mild central canal stenosis, mild foraminal narrowing, and left greater than right facet hypertrophy. (*Id.*).

On October 5, 2012, Claimant presented to the office of Bal K. Bansal, M.D., for a neurological consultation. (Tr. at 382-84). Claimant complained of severe lower back pain that radiated into the L5 nerve distribution and involved his left lower extremity. His pain worsened when he was bending, stooping, or lifting. Claimant also reported that he had to change positions frequently in order to get pain relief. He stated that the symptoms started three years earlier after he fell at work. However, his symptoms had become so severe recently that he could barely walk. Claimant indicated that he had seen a chiropractor in the past, but had never had steroid injections or physical therapy. In addition, Claimant complained of pain in the cervical area that worsened with excessive lifting. He also admitted to having depression and anxiety, although he had never received treatment for either condition. (Tr. at 382-83).

Dr. Bansal reviewed Claimant's family, surgical, and social history. In addition, he learned that Claimant was taking a variety of medications; including Percocet, Voltaren gel, Napralen, and Flexeril. (Tr. at 383). Dr. Bansal performed a physical examination. He

10

determined that at 6 feet 4 inches tall and 280 pounds, Claimant was overweight. Claimant displayed moderate to severe spasms in the lumbosacral area, mainly on the left side, with positive straight-leg raising on the left. Claimant's hip joints were normal, and he had no sacroiliac tenderness. Dr. Bansal noted mild cervical spasms, as well, with a reduced range of motion of the cervical spine. Both of Claimant's knee joints were limited, with the right worse than the left. Claimant's reflexes and muscle tone were normal, and his mental status examination was likewise normal, except he appeared depressed, anxious, and irritable. (Tr. at 383-84). Dr. Bansal documented that Claimant had some decrease in sensation with pinprick along the L5 nerve root distribution and some mild weakness of the left gluteus medius and tibialis muscles. (Tr. at 384). However, his gait, station, and tandem were unremarkable.

Dr. Bansal diagnosed Claimant with L5 radiculopathy, probably related to a disc problem at L4-L5; post-traumatic cervical and thoracic strain; depression mixed with anxiety secondary to his back injury; hypertension; and bronchial asthma. (*Id.*). Dr. Bansal advised Claimant to continue with his medications and added Cymbalta to the regimen. He learned that Claimant had undergone a nerve conduction study and MRI, so Dr. Bansal planned on reviewing the results to see if they correlated.

Claimant returned to Dr. Bansal's office on April 5, 2013. (Tr. at 395). Claimant continued to have lower back pain along the L5 nerve distribution and reported that the pain became unbearable whenever he was bending, stooping, or lifting anything that weighed more than five pounds. However, Claimant advised that Percocet controlled his pain. He also indicated that Cymbalta was helping to reduce his depression.

On physical examination, Claimant displayed significant spasms in the lumbosacral area, primarily on the left side, and positive straight-leg raising at 50 degrees

on the left. He had decreased sensation with pinprick along the L5 nerve distribution. (*Id.*). The remainder of his examination was essentially unchanged, although he showed greater difficulty heel walking on the left side than on the right side. Claimant still appeared somewhat anxious, but the rest of his psychiatric examination was unremarkable. Dr. Bansal noted that he had reviewed Claimant's nerve conduction study, performed the day prior, and it clearly showed L5 radiculopathy to the left. Dr. Bansal renewed Claimant's Percocet, and instructed him to use a TENS unit, continue with physical therapy exercises, try to be as active as possible, and return in three months. (Tr. at 395, 397-402).

Claimant returned to Dr. Bansal's office on July 2, 2013. (Tr. at 405). Claimant's symptoms had not changed much, although he reported that he could control them with medication. He stated that he had tried to return to work, but was unable to perform his job duties. His depression was improved, but he still had some unresolved pain in the thoracic spine. Dr. Bansal documented that Claimant's examination was unchanged. He recommended that Claimant continue taking his medications; avoid bending, stooping, or lifting, but otherwise try to be as active as possible; continue using the TENS unit and doing his exercises; and to return in three months. (*Id.*).

On October 2, 2013, Claimant presented to Dr. Bansal's office for follow-up. (Tr. at 407-08). He stated that as long as he took his medication, he was doing better. In particular, his C6 radiculopathy symptoms on the left side were doing remarkably better than before. Claimant reported that he still had thoracic and lower back pain, which required him to change positions frequently. His current medications included Neurontin, Voltaren gel, Lidoderm patches, Klonopin, and Oxycodone. (*Id.*). Dr. Bansal performed a physical examination that showed significant cervical spasms with

limitations on range of motion. The remainder of the examination was essentially unchanged, although Claimant had significant lumbosacral spasms on the right side with a negative straight-leg raising test. Claimant appeared anxious and irritable, but his psychiatric examination was otherwise normal. Dr. Bansal recommended that Claimant continue taking his medications; avoid bending, stooping, and lifting; see a neurosurgeon when possible; continue doing physical therapy exercises; continue with his primary care physician; and return in three months. (Tr. at 407-08).

On January 16, 2014, Claimant was evaluated by Dr. Gregory Chaney. (Tr. at 415-17). Claimant's chief complaints included depressive disorder, anxiety, kidney stone, and hypertension. (Tr. at 415). Claimant was noted to be 6 feet 4 inches tall and weighed 285 pounds. (Tr. at 416). He displayed mild hypertension with associated fatigue and muscle weakness. Claimant reported having dry mouth and dizziness, but no other complaints. He denied having depression or sleep disturbances. Dr. Chaney did not record physical examination findings. However, he diagnosed Claimant with hypertensive disorder, anxiety, depressive disorder, and kidney stone. (Tr. at 416-17).

Claimant returned to Dr. Chaney's office on February 3, 2014 with complaints of anxiety and depression that were worse during the day. (Tr. at 411-12). Nevertheless, Claimant reported sleeping well and had a good appetite. Dr. Chaney did not record any physical examination findings. His diagnoses included hypertensive disorder, depressive disorder, anxiety, low back pain, thoracic back pain, neck pain, and hip pain. (Tr. at 413).

**B. Evaluations and Opinions**

On July 14, 2012, Claimant was examined by Stephen Nutter, M.D., at the request of the SSA. (Tr. at 371-74). Claimant's primary complaint involved his lower back. He stated that he had experienced problems with back pain ever since he fell at work three

years earlier. (Tr. at 371). He also suffered from neck pain for about one year. His back pain radiated down his left leg, while his neck pain radiated down his left arm. Claimant reported having an aggravation of pain when bending, stooping, sitting, lifting, standing, coughing, riding in a car, turning his head, and when making rapid motions of his head and neck. In addition, Claimant complained of pain in the left hip, left shoulder, and both knees. (Tr. at 372). Dr. Nutter performed a physical examination, which revealed that Claimant weighed 275 pounds and stood 6 feet 3 inches. His visual acuity without correction was 20/20 and 20/25. In general, Dr. Nutter observed that Claimant walked with a normal gait and used no handheld devices. He appeared stable at station and comfortable in both the sitting and supine positions. His intellectual functioning was normal, and he had no problem hearing conversational voices. Claimant's head, ears, nose, throat, neck, chest, and cardiovascular system were normal, except there was +1 pitting edema in the left lower extremity. (*Id.*).

An examination of Claimant's upper extremities revealed pain and tenderness in the left shoulder, with no pain in the right shoulder, elbows, or wrists. (Tr. at 373). Claimant's hands and fingers appeared normal, and his grip strength was 5/5 bilaterally. An examination of Claimant's lower extremities showed pain in the knees with squatting and some crepitus bilaterally. His ankles and feet had no crepitus. Claimant's legs showed no evidence of tenderness, redness, warmth, swelling, fluid, or laxity. Claimant's cervical spine was painful and tender in the paraspinal muscles and spinous processes, but there was no evidence of paravertebral spasms. Claimant's dorsolumbar spine showed normal curvature, without paravertebral spasms. Claimant complained of tenderness of the muscles to the left of the L3-L5 area. Straight-leg raise was negative in both sitting and supine positions. Claimant could stand on one leg without difficulty. He complained of

pain with range of motion testing of the hips and lumbar spine; however, there was no hip joint tenderness, redness, warmth, swelling, or crepitus. (Tr. at 373-74).

On neurological evaluation, Claimant had normal muscle strength bilaterally in upper and lower extremities, except for hip strength, which was reduced to 4/5. (Tr. at 374). There was no evidence of atrophy, and Claimant's reflexes and sensation were intact. Claimant was able to walk on his heels and his toes, could perform a tandem gait with minimal difficulty balancing, and could squat, albeit with some knee pain. Dr. Nutter diagnosed Claimant with chronic cervical and lumbar strain without evidence of radiculopathy and degenerative arthritis. He commented that Claimant had a reduced range of motion in his knees and shoulders, but had no evidence of rheumatoid arthritis. (*Id.*).

On July 16, 2012, Rachel Arthur, M.A., of Associates in Psychology & Therapy, performed an interview and mental status examination of Claimant for the SSA. (Tr. at 377-80). She noted that Claimant arrived at the evaluation alone, having driven there in a car he borrowed from a friend. (Tr. at 377). He was well-groomed and had good hygiene. His posture was unremarkable, but his gait appeared unsteady. He reported applying for disability benefits due to back pain and memory loss. He stated that his disability started three years earlier when he fell at work. He did try to return to work, but was unable to perform his job duties, and his symptoms had worsened since then. Claimant stated that he lived alone, and was financially supported by family and friends. He complained of being depressed because he was unable to do the activities that he used to do. Claimant also was anxious about his financial situation and had started experiencing problems with his memory.

Ms. Arthur reviewed Claimant's medical history, substance abuse history, legal

history, social and developmental history, educational history, and vocational history. (Tr. at 378). She learned that Claimant had never received mental health counseling and had no psychiatric hospitalizations. He completed the twelfth grade, without discipline problems. Claimant had been employed most of his life, either managing restaurants or as a service technician. Claimant had been married twice, was currently divorced, and had three children. He had never had any difficulties with the law.

Claimant was described as cooperative during the interview and examination. He was socially appropriate and demonstrated a sense of humor. Claimant's rate of speech was average; his speech was coherent and logical; and he spoke at an average volume. Claimant's mood was euthymic, and he displayed no impairment in thought processes or content. Claimant's insight and judgment were within normal limits. (Tr. at 378-79). He had no deficits in memory or concentration, but displayed some behaviors consistent with pain. (Tr. at 379). Ms. Arthur diagnosed Claimant with depressive disorder, not otherwise specified. His prognosis was good; particularly, if his pain was alleviated. Ms. Arthur documented Claimant's daily activities as attending to his personal grooming, cooking simple meals, watching television, performing light cleaning, occasionally shopping and driving, and handling his finances. Claimant's social functioning was within normal limits; and his persistence and pace were also normal. (Tr. at 379-80).

On November 19, 2012, Dr. Bansal completed a Residual Physical Functional Capacity Evaluation, which was submitted to the SSA by Claimant's counsel. (Tr. at 387, 389). Dr. Bansal documented Claimant's primary diagnosis to be lumbosacral radiculopathy. Claimant also had diagnoses of post-traumatic cervical and thoracic strain, depression with anxiety, hypertension, and bronchial asthma. (Tr. at 387). Dr. Bansal opined that Claimant could occasionally lift and carry twenty pounds; frequently lift and

carry less than ten pounds; sit two hours in an eight-hour day; and stand or walk two hours in an eight-hour day. Claimant had a limited ability to push and pull, both with his upper and lower extremities, and he needed to alternate positions every thirty minutes to one hour. Dr. Bansal indicated that Claimant could occasionally balance, stoop, and kneel; however, he could never climb, crouch, or crawl. (*Id.*). He felt Claimant's ability to reach, handle, finger, and feel were all limited; and Claimant needed to avoid all exposure to extreme temperatures, wetness, humidity, noise, vibration, fumes, odors, and hazards.

A similar RFC form was completed by Dr. Bruce Guberman on March 7, 2013 and was submitted to the SSA by Claimant's counsel. (Tr. at 390, 394). Dr. Guberman listed Claimant's primary diagnoses as back problems, degenerative disc disease L5-S1 with disc bulges from L3-S1. (Tr. at 390). In addition, Claimant had memory problems, depression, anxiety, and hypertension. Dr. Guberman opined that Claimant could occasionally lift and carry ten pounds; frequently lift and carry less than ten pounds; sit two hours in an eight-hour day; and stand or walk two hours in an eight-hour day. Claimant had a limited ability to push and pull, both with his upper and lower extremities, and he needed to alternate positions every thirty minutes. Dr. Guberman felt that Claimant should only occasionally climb stairs or ramps; and he should never climb ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; or crawl. (*Id.*). He opined that Claimant's ability to reach and feel were limited, but he had unlimited ability to handle and finger. According to Dr. Guberman, Claimant needed to avoid moderate exposure to extreme temperatures, wetness, humidity, and vibrations; concentrated exposure to noise; and all exposure to fumes, odors, and hazards. (*Id.*). He added that in his opinion, Claimant had been disabled since June 4, 2009.

Dr. Chaney also completed an RFC assessment form, apparently at Claimant's

request. (Tr. at 409-10). He listed Claimant's primary diagnoses as L5 radiculopathy and degenerative disc disease L5-S1 with disc bulges from L3-S1. (Tr. at 409). In addition, Claimant had memory problems, depression, anxiety, and hypertension. Dr. Chaney opined that Claimant could occasionally lift and carry ten pounds; frequently lift and carry less than ten pounds; sit two hours in an eight-hour day; and stand or walk two hours in an eight-hour day. Claimant had a limited ability to push and pull with his upper extremities, and he needed to alternate positions every twenty to thirty minutes. Dr. Chaney believed that Claimant could occasionally climb stairs or ramps, but should never climb ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; or crawl. (*Id.*). He felt that Claimant's ability to reach and feel were limited, but he had unlimited ability to handle and finger. In Dr. Chaney's view, Claimant needed to avoid moderate exposure to extreme temperatures, wetness, and humidity; concentrated exposure to noise; and all exposure to vibrations, fumes, odors, and hazards. (*Id.*). He also added that in his opinion, Claimant had been disabled since June 4, 2009.

On February 12, 2014, Claimant's counsel submitted a mental RFC assessment prepared by Dr. Bansal. (Tr. at 419-21). In the category of understanding and memory, Dr. Bansal felt that Claimant was moderately limited in remembering and understanding detailed instructions, but was not significantly impaired in his ability to remember and understand simple instructions, locations, and work-like procedures. (Tr. at 419). With respect to concentration and persistence, Dr. Bansal opined that Claimant was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform within a schedule, maintain regular attendance at work, be punctual, sustain an ordinary routine without supervision, complete a normal workday without interruptions from psychologically-based symptoms,

and perform at a consistent pace without excessive interruptions and breaks. (Tr. at 419-20).  Dr. Bansal believed Claimant's social functioning was essentially normal, except he was moderately limited in his ability to interact with the general public. (Tr. at 420). In addition, Dr. Bansal opined that Claimant would have moderate difficulty with changes in the work setting. Dr. Bansal did not provide any explanation for his opinions.

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

### A. Duty to Develop the Record

Claimant contends that the ALJ failed to fully develop the record with regard to his "extensive complaints of injuries, pain, discomfort, and limitations." (ECF No. 10 at 10). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [his] multiple medical problems," the ALJ could not properly analyze his impairments as required by the Regulations. (*Id.* at 11) Having reviewed the entirety of the record, the undersigned finds that this argument lacks merit.

Certainly, an ALJ has the duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). However, an ALJ is not required to act as a claimant's counsel. *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (unpublished table decision) (citing *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)). The ALJ has the right to presume that a claimant's counsel presented the strongest case for benefits. *Nicholson v. Astrue,* 341 F. App'x 248, 253 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)). Ultimately, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

Indeed, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935

(11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Id.* at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

In this case, Claimant, who was represented by counsel at his administrative hearing, has failed to identify any evidentiary gaps in the record. *See Nye v. Colvin*, No. 3:13-12115, 2014 WL 2893199, at *20 (S.D.W.Va. June 26, 2014) (rejecting identical argument where claimant did not identify evidentiary gaps). Furthermore, he has entirely neglected to proffer what evidence could have been adduced that might have changed the result of the proceedings. *See Scarberry v. Chater*, 52 F.3d 322, 1995 WL 238558, at *4 n.13 (4th Cir. Apr. 25, 1995) (unpublished table decision) (rejecting failure to develop record argument where claimant did not "identify what the missing evidence would have shown"). Indeed, contrary to his argument, Claimant admits that his injuries and their treatment are "documented by the extensive records" prepared by his treating health care providers and submitted to the SSA. The ALJ carefully reviewed Claimant's treatment records, examined the RFC opinions supplied by Claimant's physicians, obtained physical and mental assessments from agency experts, and considered Claimant's testimony. *See Toney v. Shalala*, 35 F.3d 557, 1994 WL 463427, at *2 (4th Cir. Aug. 29, 1994) (unpublished table decision) (holding record was adequately developed where ALJ considered examination reports, medical opinions, claimant's testimony, medical records, and vocational expert testimony). The medical records and opinion evidence

considered by the ALJ certainly encompassed Claimant's allegations related to all of his physical and mental impairments. (Tr. at 30-34). Furthermore, Claimant's argument lacks a sound factual basis, as the record was well-developed and certainly provided more than adequate information upon which the ALJ could properly evaluate Claimant's application for benefits. An adverse decision alone does not entitle Claimant to a remand for further factual development. Accordingly, the undersigned **FINDS** that the ALJ did not err in failing to more fully develop the record.

### B. The ALJ's Evaluation of Opinion Evidence

As mentioned above, interspersed in Claimant's development of the record argument is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians," in violation of applicable law. (ECF No. 10 at 10). More particularly, Claimant asserts that the ALJ ignored the opinions expressed by Dr. Bansal, Dr. Chaney, and Dr. Guberman in their RFC assessments. (*Id.*)

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, the SSA gives more weight to the opinion of an examining medical source than to the

opinion of a non-examining source. *See* 20 C.F.R. § 404.1527(c)(1). Even greater weight is allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, the "treating physician rule" requires a treating physician's opinion to be given controlling weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[2] listed in 20 C.F.R. § 404.1527(c)(2)-(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the Regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Here, Claimant argues that the ALJ ignored treating physicians' opinions that

Claimant should never climb ladders, ropes, or scaffolds; should never balance, crouch, or crawl; and was limited to sitting or standing only four hours out of an eight-hour workday. (ECF No. 10 at 10). Claimant further contends that the ALJ ignored the opinions of Dr. Bansal regarding Claimant's significant work-related limitations caused by his depression and anxiety. Finally, Claimant argues that, notwithstanding the consistency of the treating physicians' RFC assessments, the ALJ rejected the opinions in favor of agency opinions that should have carried less weight.

A review of the written decision confirms that the ALJ considered the opinions of Drs. Chaney, Bansal, and Guberman and provided reasons for discounting or rejecting them. First, with respect to Dr. Chaney, the ALJ noted that Dr. Chaney saw Claimant on three occasions and prescribed pain medication, but the ALJ questioned whether Dr. Chaney was actually a "treating" physician. (Tr. at 32). The ALJ noted Dr. Chaney's significant limitations on the RFC assessment form and his statement that Claimant had been disabled since June 2009, and gave these opinions little weight. The ALJ explained that the limitations were contrary to the other evidence, and Dr. Chaney provided no objective support for the limitations noted on the form. In addition, the ALJ observed that Dr. Chaney's statement regarding Claimant's disability was not a medical opinion, but was a medical-vocational determination reserved for the Commissioner. (Tr. at 33).

Although at this point in the written decision the ALJ did not specify the precise evidence he felt was contradictory to Dr. Chaney's opinions, the nature of the evidence is clear from the ALJ's discussion earlier in the opinion. (Tr. at 30-32). In particular, the ALJ discussed Claimant's daily activities, noting that Claimant could wash dishes, perform light household chores, shop, drive, and watch television. At his psychological evaluation by Ms. Arthur, Claimant also admitted to living alone and to being

25

independent in personal grooming. Ms. Arthur found Claimant to have normal social functioning, persistence, and pace. (Tr. at 31). In addition, the ALJ discussed the findings of Dr. Stephen Nutter, an internal medicine consultant who examined Claimant in July 2012. Dr. Nutter found Claimant to have chronic cervical and lumbar strain, but saw no evidence of radiculopathy, degenerative arthritis, or rheumatoid arthritis. Claimant's straight-leg raising test was negative in both the sitting and supine positions; his sensory testing was normal; and there was no evidence of nerve root compression. (Tr. at 31-32). After considering the side effects of Claimant's medications, as well as the triggers of his symptomatology, the ALJ found that Claimant was capable of performing work-related functions with certain limitations. (Tr. at 32).

Turning to the opinions of Dr. Guberman, the ALJ indicated that Dr. Guberman completed a one-page form consisting of a series of checklists, and like Dr. Chaney, he failed to identify any evidence in support of the extreme limitations he checked on the form. (Tr. at 33). Given the lack of objective findings corroborating Dr. Guberman's opinions, the ALJ afforded the RFC assessment little weight. Moreover, the undersigned notes that Dr. Guberman does not appear to be a treating physician. Claimant never explicitly identified Dr. Guberman as one of his treating physician;[3] Dr. Guberman's name does not appear on any of Claimant's prescriptions; and no treatment records from Dr. Guberman were provided by Claimant or his counsel. Indeed, the only document in the record prepared by Dr. Guberman is the one-page, pre-printed, check-marked RFC form. Consequently, it is a mystery as to what information Dr. Guberman considered when

[3] Dr. Guberman is listed on an SSA form regarding recent medical treatment, but the dates of his treatment are not provided. (Tr. at 295). The form is not signed; therefore, it is not at all clear that Dr. Guberman actually treated Claimant. Moreover, in the absence of a treatment record or evaluation report, it is likewise unclear whether Dr. Guberman ever even examined Claimant.

26

preparing the RFC assessment and what evidence formed the basis of his opinions.

Finally, the ALJ examined the opinions offered by Dr. Bansal. (Tr. at 33). The ALJ reviewed the treatment records of Dr. Bansal, acknowledging that he had seen Claimant on several occasions for low back and cervical pain, with periodic complaints of bilateral knee pain. The ALJ stressed that Dr. Bansal primarily treated Claimant with narcotic pain relievers. Dr. Bansal ordered nerve conduction studies, which he interpreted as showing lumbar radiculopathy, but the remainder of the examination was normal. Despite a paucity of objective findings, Dr. Bansal included a number of significant limitations on the RFC assessment form. Once again, no explanation for the limitations was supplied, and other objective and anecdotal evidence failed to substantiate the severity and breadth of the limitations indicated by Dr. Bansal. (Tr. at 33).

In sum, the undersigned **FINDS** that the ALJ provided good reasons for assigning little weight to the opinions of Drs. Chaney, Guberman, and Bansal. Dr. Chaney only saw Claimant a few times; and it is unclear whether Dr. Guberman saw Claimant at all. Dr. Bansal saw Claimant on four occasions, but did little to treat his underlying low back condition. Instead, Dr. Bansal provided Claimant with medications, which Claimant reported at several office visits were quite helpful in reducing his symptoms. None of these physicians had the type of longstanding treatment relationship with Claimant which allowed the physician to develop a longitudinal picture of Claimant's ailments and limitations. Furthermore, none of the physicians provided *any explanation or pointed to any specific finding* that supported the exertional, postural, manipulative, and environmental limitations he assigned to Claimant.[4] (Tr. at 432-33). Finally, the medical,

---

[4] For example, the physicians opined that Claimant was "limited" in certain manipulative activities; yet, none of the physicians explained what was meant by the term "limited," nor provided a medical basis for the limitations.

opinion, and anecdotal evidence discussed by the ALJ earlier in the decision provided a substantial basis for the ALJ's conclusion that the three RFC assessments supplied by Claimant's counsel were entitled to little weight.

To the extent that the ALJ could have done a better job specifying the inconsistent or conflicting evidence that supported his decision, any error was harmless because his rationale was plain, and his decision was supported by substantial evidence. *Emrich v. Colvin*, 90 F. Supp. 3d 480, 488 (M.D.N.C. 2015) ("In social security cases, an ALJ's errors are harmless so long as the ALJ's conclusion is supported by substantial evidence in the record and the claimant could not reasonably have been prejudiced by the error.") (citing *Tanner v. Comm'r of Soc. Sec.,* No. 14–1272, 602 Fed.Appx. 95, 101, 2015 WL 574222, at *5 (4th Cir. Feb. 12, 2015)). "In general, remand of a procedurally deficient decision is not necessary 'absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'" *Plowden v. Colvin*, No. 1:12-CV-2588-DCN, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (quoting *Connor v. U.S. Civil Serv. Comm'n,* 721 F.2d 1054, 1056 (6th Cir. 1983)). The burden of showing that the error was prejudicial rests with the party attacking the agency's determination. *Johnson v. Colvin*, No. 2:12-CV-01475-JMC, 2013 WL 5139122, at *3 (D.S.C. Sept. 11, 2013) (citing *Shinseki v. Sanders,* 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009)); *see, also, Johnson v. Colvin*, No. 2:12-CV-01475-JMC, 2013 WL 5139122, at *3 (D.S.C. Sept. 11, 2013) ("[I]n situations where the harm is not obvious and/or the Commissioner points to overwhelming evidence that supports the ALJ's conclusions despite the error, the court will require the plaintiff to establish prejudice"). Although the ALJ's written discussion of the opinion evidence was not perfect, ensuring perfection is not the aim of the substantial evidence test. *See, e.g.*, *Reynolds v. Colvin*, No.

28

6:13-cv-22604, 2014 WL 4852242, at *21 (S.D.W.Va. Aug. 19, 2014).

Accordingly, the undersigned **FINDS** that the ALJ properly weighed the medical source opinions and provided an adequate explanation of the reasons for the weight he gave to each opinion.

### C. Combination of Impairments Equivalent to a Listing

Finally, Claimant asserts that "the totality of [his] medical and mental problems, when combined, totally disable him and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 10 at 11). Claimant further insists that "[t]he overwhelming and contradicted competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical impairments render him unable to function for 8 hours in any type of job." (Tr. at 11-12)

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. § 404.1520(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at

530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *see also* 20 C.F.R. § 404.1526. Under the applicable Regulations, the ALJ may find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listed impairment, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, then equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria; (2) if the claimant's impairment is not described in the Listing, then equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment; or (3) if the claimant has a combination of impairments, no one of which meets a listed impairment, then equivalency can be proven by comparing the claimant's findings to the most closely analogous listings. If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar impairment. 20 C.F.R. § 404.1526(b). However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

Contrary to Claimant's assertion, however, there is no "combination of impairments" listing. Instead, the Supreme Court has explained that "[f]or a claimant to

30

qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19, 1983 WL 31248).[5] "This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 710 (6th Cir. 2013) (citing *Zebley*, 493 U.S. at 532).

Thus, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. Accordingly, Claimant's assertion that "competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical and mental impairments render him unable to function for 8 hours in any type of job," is simply insufficient to establish that his combination of impairments is equivalent to a listed impairment that would warrant a finding of disability. In sum, Claimant has failed to identify any specific listing that his impairments meet or equal, and his functional impact argument is unavailing. *See Nye*, 2014 WL 2893199, at *24-*25 (rejecting identical

---

[5] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zebley* remains relevant to this case.

argument). Therefore, the undersigned **FINDS** that this challenge to the Commissioner's decision is without merit.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 30, 2015

Cheryl A. Eifert
United States Magistrate Judge